# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|   |   |   |
|---|---|---|
| NATIONAL CHILDREN'S CENTER, INC., | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 13-1036 (RMC) |
| v. | ) ) ) | |
| SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 500, | ) ) ) | |
| Defendant. | ) ) ) | |

## OPINION

A collective bargaining agreement can grant to management exclusive authority over certain subjects. When an agreement includes such provisions, an arbitrator acts outside his authority when he performs tasks reserved for management under the agreement. Because the arbitrator did just that in this case, his award will be vacated. However, whether the grievant's discharge was arbitrary and capricious is a question reserved for the arbitrator on reconsideration. Accordingly, the arbitration award will be vacated and remanded for further proceedings consistent with this Opinion.

## I. FACTS

National Children's Center, Inc. (NCC), is a community-based non-profit which serves high-risk children and adults with moderate to severe mental retardation and developmental disabilities. NCC's Early Intervention Program[1] provided child care and therapeutic services for children from birth through age five. *See* NCC Mot. for Summ. J. [Dkt. 11-1] at 1.

---

[1] NCC's Early Intervention Program is now called the Early Learning Services Program.

Local 500, Service Employees' International Union (SEIU or Union) represented certain employees in NCC's Early Intervention Program. The Union and NCC negotiated a collective bargaining agreement for the period February 1, 2008, through January 31, 2011. *See id.*, Ex. 4 (2008 Collective Bargaining Agreement) [Dkt. 11-7]. On October 3, 2011, SEIU and NCC agreed to a second collective bargaining agreement, which governs this action. *See id.*, Ex. 5 (2011 Collective Bargaining Agreement) [Dkt. 11-8].

**A. The Nix Grievance**

Rachel Nix worked for NCC as a Teacher Assistant in the Early Intervention Program until May 18, 2012.[2] The instant dispute arose from an incident in which Charese Drake, a former NCC employee, was fired from NCC and subsequently asked Ms. Nix to remove Ms. Drake's personal belongings from NCC's premises. According to NCC, Ms. Nix removed "wagons full" of Ms. Drake's belongings, including a television set that had been used in the classroom but was owned by Ms. Drake. *See* Compl. [Dkt. 1] ¶ 16. NCC was unaware that Ms. Nix had removed Ms. Drake's belongings until Ms. Nix herself informed her supervisor and NCC's Principal so that NCC could replace the television.

In 2004, before NCC and the Union had executed a collective bargaining agreement, NCC had implemented a work rule that defined "gross misconduct." *See* NCC Mot. for Summ. J., Ex. 1 (NCC Employee Handbook) [Dkt. 11-4] at 37. Specifically, Section 703.6 of NCC's Employee Handbook provided that "gross misconduct include[s], but [is] not limited to . . . Stealing or removing, without permission, NCC property or property of another Employee, individual, or visitor." *Id.* Ms. Nix received NCC's Employee Handbook on two separate occasions in 2004 and 2008. Despite the fact that she signed a form on February 17, 2004,

---

[2] Ms. Nix also served on occasion as a bus driver for NCC's Early Intervention Program.

acknowledging her obligation to "read, understand, familiarize [herself] with, and adhere to the policies contained in the Employee Handbook," *id.*, Ex. 3 (Acknowledgement and Receipt of NCC Handbook) [Dkt. 11-6] at 2, Ms. Nix did not review the Handbook prior to her removal of Ms. Drake's belongings from NCC's premises. Nor did she ask any NCC supervisor for permission to do so.

Ms. Nix was suspended from NCC pending an investigation into whether her removal of Ms. Drake's property constituted "gross misconduct" under Section 703.6. During NCC's investigation, Ms. Nix candidly admitted that she had taken Ms. Drake's personal belongings from NCC. Shortly thereafter, NCC discharged Ms. Nix for "gross misconduct." *See* NCC Employee Handbook at 37 (providing that if an employee commits gross misconduct, "[s]uch behaviors/actions may lead to any of the following forms of discipline: verbal warning, written warning, probation/suspension, or termination from employment"). Ms. Nix grieved her discharge. After the parties failed to resolve the grievance, SEIU presented Ms. Nix's grievance to an arbitrator.

**B. Relevant Contract Terms**

The NCC disciplinary process was set forth in its 2011 collective bargaining agreement and gave NCC the discretion to implement rules regarding subjects not expressly covered by the contract.[3] Specifically, Article 25, "NCC Policies," provided that, "[t]o the extent a subject or matter is not specifically and directly covered by this Agreement, the applicable NCC policies . . . shall govern. NCC shall have the right and authority to modify, eliminate or create new policies . . . to the extent their specific subject matter is not covered by this Agreement." 2011 Collective Bargaining Agreement at 15. Relatedly, Article 42 of the

---

[3] The provisions of the 2011 collective bargaining agreement, which applied to Ms. Nix's grievance, were carried forward without change from the 2008 contract.

3

2011 contract stated that "[a]ll management rights, authority, functions and responsibilities which are not unequivocally and expressly restricted or limited by a specific provision of [the collective bargaining agreement] are retained by NCC and shall remain vested exclusively in its sole discretion to manage NCC . . . ." *Id.* at 25.

Based on these provisions, NCC re-published and distributed its Employee Handbook in 2008, which defined "gross misconduct" as, *inter alia*, "[s]tealing or removing, without permission, NCC property or property of another Employee, individual or visitor." NCC Employee Handbook at 37. Thus, NCC re-published its Employee Handbook to implement its reserved management authority under the 2008 collective bargaining agreement. NCC relied on the same reserved authority, as provided in its 2011 collective bargaining agreement, to maintain its work rules through 2013.

Article 37 of the 2011 contract established the standard of review for challenges to NCC's disciplinary decisions. Titled "Discharge and Discipline," Article 37 provided that:

> NCC shall have the authority to discipline and discharge employees for just cause. It is recognized and agreed between the parties that NCC must maintain and impose high standards of performance, quality of work and care. Accordingly, *it is agreed that "just cause" is defined as NCC's determination that an employee does not meet this high standard, so long as NCC does not exercise its discretion in a manner that is arbitrary, capricious, or without foundation* and NCC bears the burden of showing that just cause existed.

2011 Collective Bargaining Agreement at 21 (emphasis added). The collective bargaining agreement therefore authorized NCC to discharge employees subject to the limited caveat that this discretion could not be exercised "in a manner that [was] arbitrary, capricious, or without foundation." *Id.*

4

Further, Article 41 of the 2011 collective bargaining agreement limited the scope of arbitral review as follows:

> [t]he arbitrator shall have authority only to interpret and apply the explicit provisions of [the collective bargaining agreement] to the extent necessary to decide the submitted grievance, basing his/her decision on the express language of [the collective bargaining agreement], without amending, modifying, adding to, subtracting from, or changing this Agreement. The arbitrator shall have no power or authority to . . . (ii) substitute his judgment or discretion for NCC's judgment or discretion . . . .

*Id.* at 25.

### C. The Arbitrator's Decision

The arbitrator issued his decision on June 10, 2013. *See* NCC Errata [Dkt. 13], Ex. 1 (Arbitration Decision) [Dkt. 13-1]. The arbitrator noted that the issue presented to him was whether Ms. Nix was terminated for just cause, as defined in the collective bargaining agreement. The arbitrator further recognized that Ms. Nix was fired for "Violation of Policy . . . Section 703 (Gross Misconduct), Number 6 (Stealing or removing, without permission, NCC property or property of another Employee, individual, or visitor)." Arbitration Decision at 4–5 (internal quotation marks omitted).

Although Ms. Nix had not reviewed Section 703.6 until she was suspended pending termination, she testified that she fully understood Section 703.6 after she reviewed its terms. Arbitration Decision at 16. Ms. Nix also admitted her duty to familiarize herself with NCC's Employee Handbook. The arbitrator concluded that "[Ms.] Nix's professed ignorance of the rule [was] not a sufficient reason to excuse her from the consequences of violating the rule." *Id.* at 14.

The arbitrator also addressed NCC's interpretation of the work rule, which required an employee to obtain NCC's permission before removing another employee's personal belongings:

> NCC's interpretation is a reasonable interpretation of the language as written, and is consistent with most employers' desires to control the removal of property from the work site.
>
> NCC especially has a legitimate interest in wanting to control a dismissed employee's access to its premises, either directly or through a surrogate. It certainly has the authority to write a rule that prohibits any current employee from removing property from its premises on behalf of a dismissed employee without first obtaining NCC's permission. That is exactly what NCC did in writing Section 703, Number 6.

*Id.* at 15–16. The arbitrator found that "the language in Section 703, Number 6, adequately informs employees from whom permission must come before property can be removed from NCC's premises," and determined that "[Ms.] Nix violated the rule when she removed [Ms.] Drake's personal property without first obtaining permission from NCC." *Id.* at 16–17.

Nonetheless, in a striking departure from these findings, the arbitrator concluded that "[Ms.] Nix's conduct [did] not rise to the level of gross misconduct." *Id.* at 21. He relied on the following facts to support this determination:

> [Ms.] Nix did not know of the rule, even though she should have been aware by reading the Handbook. There is a distinction between willful flaunting of a rule and negligence in not familiarizing oneself with a rule.
>
> . . . .
>
> [Ms.] Nix did not steal; she had [Ms.] Drake's permission; she brought what she did to management's attention; and the rule she violated is somewhat ambiguous. I find NCC acted in an arbitrary and capricious manner when it terminated [Ms.] Nix for violating the rule set out in Section 703, Number 6 of the Handbook.

*Id.* at 20–21.

Thus, the arbitrator concluded that NCC acted in an arbitrary and capricious manner, *i.e.*, without just cause, when it terminated Ms. Nix for violating Section 703.6. Accordingly, he granted the Union's grievance and remanded the case to the parties for a determination of the appropriate remedy. When the parties could not agree, he ordered a thirty-day suspension and reinstatement. *Id.*, Supp. Decision [Dkt. 13-1] at 2.

### D. Procedural History

NCC filed its Complaint on July 9, 2013, asking the Court to vacate the arbitration award. NCC alleges that, "[i]n rendering his Opinion and Award, and contrary to the express terms of the [collective bargaining agreement], the Arbitrator substituted his definition of 'just cause' for that agreed upon by the parties in the Agreement." Compl. ¶ 24. NCC contends that the arbitration award is not enforceable under the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a), or the D.C. Arbitration Act, D.C. Code § 16-4401 *et seq.* SEIU filed a counterclaim against NCC on August 15, 2013, seeking confirmation and enforcement of the arbitration award and requesting attorney fees and costs for defending against NCC's allegedly unsupported legal position.

The parties filed cross-motions for summary judgment. While NCC argues that the arbitrator exceeded his authority by substituting his judgment and discretion for that of NCC, the Union contends that this Court is bound by an "extremely deferential" standard of review that requires confirmation of the award "so long as the arbitrator even *arguably* interpreted or applied the parties' agreement—and regardless of whether the court believes that the arbitrator's construction of the agreement was wrong . . . ." SEIU Mot. for Summ. J. [Dkt. 12] at 2 (emphasis in original) (citing *Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2068 (2013)).

## II.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.  *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "[t]he mere existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  In addition, the nonmoving party cannot rely solely on allegations or conclusory statements.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor.  *Id.*  If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249–50 (citations omitted).

## III.  ANALYSIS

A collective bargaining agreement is a peculiar type of contract with a special place in federal law.  Since Congress enacted the National Labor Relations Act of 1935 (NLRA), 29 U.S.C. § 151 *et seq.*, courts have interpreted and enforced the federal common law applicable to collective bargaining agreements.  *See, e.g., Textile Workers Union of Am. v. Lincoln Mills of*

*Ala.*, 353 U.S. 448, 456 (1957) ("[T]he substantive law to apply . . . is federal law, which the courts must fashion from the policy of our national labor laws.").

The crown jewel of U.S. labor relations is the process of binding arbitration before a neutral arbitrator, which prevents the resolution of economic disputes by coercive means during the term of a collective bargaining agreement. The Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.*, is a recent addition to the statutory framework advancing general arbitration. While the FAA specifically applies to general arbitration, legal principles derived from the LMRA and FAA are often cited interchangeably. Because NCC and SEIU consented to arbitration, and therefore agreed to bind themselves to an arbitrator's interpretation of their collective bargaining agreement, the Court may only conduct a limited review of the arbitration award. *See E. Associated Coal Corp. v. United Mine Workers of Am.*, 531 U.S. 57, 62 (2000).

In this case, the arbitrator denied NCC the benefit of the bargained-for terms of its collective bargaining agreement, specifically, NCC's right to distinguish and define "gross misconduct." The arbitrator acknowledged that Section 703.6 fulfilled legitimate management purposes and that Ms. Nix had no reasonable excuse for her ignorance of the rule. *See* Arbitration Decision at 14–16. Nonetheless, the arbitrator contravened the express terms of the collective bargaining agreement by finding that Ms. Nix's conduct "d[id] not rise to the level of gross misconduct." *Id.* at 21. The collective bargaining agreement reserved to *NCC* the discretion to craft workplace rules and define "gross misconduct." *See* 2011 Collective Bargaining Agreement at 25. The arbitrator therefore ruled in contravention of the collective bargaining agreement by "substitut[ing] his [own] judgment or discretion for NCC's judgment or discretion." *Id*; *see also United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).

9

The Union seeks to avoid this result by arguing that "[a] court must enforce a labor arbitration award so long as the arbitrator was 'even arguably construing or applying the contract.'" SEIU Mot. for Summ. J. at 5 (quoting *Nat'l Postal Mail Handlers Union v. Am. Postal Workers Union*, 589 F.3d 437, 441 (D.C. Cir. 2009)) (other citation omitted). In other words, because NCC and the Union "'bargained for the arbitrator's construction of their [collective bargaining] agreement,'" SEIU contends that a resulting award may be vacated "'only in rare instances.'" *Id.* (alterations in original) (quoting *E. Associated Coal Corp.*, 531 U.S. at 62) (other citations omitted).

While SEIU identifies the correct legal standard, such "rare instances" for vacatur exist here. In *Enterprise Wheel*, the Supreme Court explained that:

> an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

363 U.S. at 597.

The Nix award fails this standard. The decision failed to recognize NCC's expressly retained right to fashion work rules governing subjects not expressly covered by the collective bargaining agreement. *See* 2011 Collective Bargaining Agreement at 25 ("All management rights . . . which are not unequivocally and expressly restricted or limited by a specific provision of [the collective bargaining agreement] are retained by NCC . . . ."). Because the arbitrator re-defined "gross misconduct," and thereby assumed a task reserved for management under the collective bargaining agreement, his award must be vacated.

10

To be sure, the arbitrator interpreted the "just cause" standard and relied on mitigating circumstances to find that Ms. Nix's discharge was arbitrary and capricious. *See* Arbitration Decision at 13–14 ("The [arbitrator] recognizes the [just cause] standard negotiated by the parties in their [collective bargaining agreement] and will apply that standard."); *id.* at 21 (emphasizing that "[Ms.] Nix did not steal; she had [Ms.] Drake's permission; she brought what she did to management's attention; and the rule she violated is somewhat ambiguous"). However, he failed to give NCC the benefit of its bargained-for authority to define "gross misconduct" and to make such conduct a terminable offense. Put differently, the decision substituted the arbitrator's judgment for NCC's determination that Ms. Nix committed gross misconduct. *See id.* at 21 (concluding that, "[w]hile the rule is listed under gross misconduct, under the circumstances of this case . . . [Ms.] Nix's conduct does not rise to the level of gross misconduct"). An arbitrator cannot circumvent NCC's work rule and re-write it based on his own assessment. *See Enterprise Wheel*, 363 U.S. at 597 (noting that an arbitrator's award "is legitimate only so long as it draws its essence from the collective bargaining agreement").

*Oxford Health Plans LLC*, 133 S. Ct. 2064, does not compel a different result. SEIU relies on *Oxford Health* for the proposition that "so long as the arbitrator even *arguably* interpreted or applied the parties' agreement . . . the court *must* . . . confirm[] the award." SEIU Mot. for Summ. J. at 2 (emphases in original). However, *Oxford Health* interpreted the FAA and concluded that a court may not vacate an award if the arbitrator was "arguably construing" the contract. 133 S. Ct. at 2070. This Court can rely on FAA case law as guidance, but it cannot ignore that NCC brought this action under the LMRA on the ground that the arbitrator acted "contrary to the express terms of the [collective bargaining agreement]." Compl. ¶ 24. While courts often look to FAA precedents, the federal common law interpreting collective bargaining

11

agreements ultimately governs this action. *Compare Lincoln Mills*, 353 U.S. at 456 ("[T]he substantive law to apply in suits under § 301(a) [of the LMRA] is federal law, which the courts must fashion from the policy of our national labor laws."), *with Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 (2010) (holding that, under the FAA, "the task of an arbitrator is to interpret and enforce a contract, not to make public policy"). As a result, while *Oxford Health* is of some relevance to this action, it does not have the dispositive character that SEIU attributes to it on these facts.

The arbitrator's decision does not constitute an arguable interpretation or application of the parties' agreement, but instead reflects the substitution of his own judgment for the clear management rights provided in the collective bargaining agreement. The Union does not contest that NCC had a right to promulgate rules and define "gross misconduct" for the purpose of implementing its reserved management rights. In fact, the Union does not respond to this argument and thus waives it. *See, e.g., CSX Transp., Inc. v. Commercial Union Ins., Co.*, 82 F.3d 478, 482–83 (D.C. Cir. 1996); *Jones v. Air Line Pilots Ass'n*, 713 F. Supp. 2d 29, 39 (D.D.C. 2010); *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) ("It is well understood in this Circuit that when a plaintiff files an opposition to a [dispositive motion] addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").

While *Oxford Health* undoubtedly reinforced the limited scope of judicial review, there is no indication the Supreme Court intended to change the federal common law, as explicated by *Enterprise Wheel*, that "[w]hen the arbitrator's words manifest an infidelity to [his] obligation [to draw the decision's essence from the collective bargaining agreement], courts have no choice but to refuse enforcement of the award." *Enterprise Wheel*, 531 U.S. at 597. Because

12

such infidelity is evident on the record here, the Court will vacate the arbitration award as beyond the scope of the collective bargaining agreement. However, the Court will adhere to *Oxford Health*'s admonition that "[o]nly if 'the arbitrator acts outside the scope of his contractually delegated authority' . . . may a court overturn his determination." 133 S. Ct. at 2068 (internal alterations omitted) (quoting *E. Associated Coal*, 531 U.S. at 62). While the arbitrator decided Ms. Nix's grievance based, in part, on his erroneous subjective definition of "gross misconduct," the Court will limit its ruling to a vacatur of the award. It remains for the arbitrator to decide if NCC's decision to terminate Ms. Nix for gross misconduct was "arbitrary, capricious, or without foundation." *See* 2011 Collective Bargaining Agreement at 21.

### IV. CONCLUSION

The arbitration award included two conclusions critical to this dispute: first, that Ms. Nix had not engaged in gross misconduct, and second, that her discharge was arbitrary and capricious due to mitigating circumstances. The first of these conclusions contravened NCC's right to define "gross misconduct" and ignored the contractual limits on arbitral authority. Accordingly, the arbitration award will not be confirmed. The arbitrator must decide whether NCC acted in an arbitrary and capricious manner when it fired Ms. Nix for gross misconduct. Accordingly, NCC's Motion for Summary Judgment will be granted and SEIU's Motion for Summary Judgment will be denied. The arbitration award will be vacated, and this matter will be remanded for further arbitration pursuant to the collective bargaining agreement. A memorializing Order accompanies this Opinion.

Date: September 19, 2014

/s/
ROSEMARY M. COLLYER
United States District Judge